IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAJUAN MICHELE LAWLEY,<br><br>Defendant | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS<br><br>Case No. 1:18-cr-4<br><br>Judge Clark Waddoups |

Before the court is Defendant Dajuan Michele Lawley's Motion to Suppress evidence obtained following two warrantless searches of his home on October 21, 2017. The court held an evidentiary hearing on May 9, 2018 (ECF No. 17), after which the parties filed post-hearing briefs and exhibits. (ECF Nos. 20–23.) The court then heard oral argument on the Motion on July 10, 2018. (ECF No. 26.) Having considered the evidence and arguments, and based on the findings of fact and conclusions of law contained herein, the court determines that the Government has not shown that the warrantless searches were justified under an exception to the warrant requirement. Therefore, the court GRANTS Mr. Lawley's Motion. (ECF No. 11.)

## BACKGROUND

This case is about two warrantless searches of a home in Ogden, Utah. Mr. Lawley lived at this home with two of his roommates—Shawna Gardener and Donald Denison. Officer Whitby and Sergeant Ziegler were two officers from the Ogden Police Department involved in this case. The facts of this case involve four time periods: (1) the initial response resulting in Mr. Denison's detention; (2) the first warrantless entry and search of the home; (3) the time between the two searches; and (4) the second warrantless entry and search of the home

1. <u>The Initial Response Resulting in Mr. Denison's Detention</u>

On October 21, 2017, at approximately 3:10 a.m., dispatch for the Ogden Police Department notified all available units that shots had been fired near the intersection of Madison Avenue and 23rd and 24th streets in Ogden, Utah. (*See* Tr. 6: 7–8; 44: 7–8; 45: 3–5.) Officer Whitby, Sergeant Ziegler, and "quite a few [other] officers" responded. (*See* Tr. 6: 7–8; 45: 7–8.) Officer Whitby and other officers arrived near the scene before Sergeant Ziegler. (Tr. 45: 14.) Officer Whitby was wearing a body camera at this time. (*See* Tr. 35: 14–25.)

When Officer Whitby arrived "in the general area where the shooting had been reported" (Tr. 7: 3–4), he "came across one male running across" 23rd Street and Adams Avenue. (Tr. 7: 1–2.) Officer Whitby testified that this individual "seemed pretty suspicious for the area," and "detain[ed] him at that time." (Tr. 7:10–12.) But Officer Whitby did not activate his body camera. (Tr. 35: 11–25.)

Officer Whitby learned that this individual's name was Donald Denison. (Tr. 7: 15–16.) Officer Whitby further testified that Mr. Denison was initially uncooperative, but eventually admitted that "he was coming from the area" of the shooting. (*See* Tr. 7: 24–25.) Mr. Denison also insisted that he was not the shooter but that he did not "want to divulge any information." (Tr. 8: 1–2.) While Officer Whitby was questioning Mr. Denison, Shawna Gardener approached "about 20 feet from where" Officer Whitby was standing and began "watching" him. (Tr. 8: 5–7; 13–14. )

When Ms. Gardener approached, Mr. Denison was sitting on the ground, handcuffed.[1] (Tr. 108: 16–20.) Ms. Gardener testified that she "referred to [Mr. Denison] as [her] street son."

---

[1] On Cross examination defense counsel asked Officer Whitby: "That male that was running away, [(Mr. Denison)], you had actually detained him and placed him in handcuffs?" (Tr. 24: 14–15.) Officer Whitby responded "I believe so." (Tr. 24: 16.) Later in the cross examination, Officer Whitby was asked "Well, at some point you handcuff [Mr. Denison] or you put him down and you secure him, correct?" (Tr. 36: 1–2.) Officer Whitby responded "Yes." (Tr.

(Tr. 108: 10–11.) She also testified that there were three police cars in the area. (Tr. 108: 15–16.) The police officers told her that she could not approach Mr. Denison. (*See* Tr. 109: 4.) Ms. Gardener responded that "she [did not] care and that he [had not] done anything wrong." (Tr. 109: 5–6.) Ms. Gardener also told the officers that Mr. Denison "was [her] son and that [she] came looking for him because he had to come back." (Tr. 109: 7–10.) It was around this time the officers, including Officer Whitby, began asking Ms. Gardener questions about the reported shooting. (*See* Tr. 12–13.)

Officer Whitby testified that Ms. Gardener told him that "she was having a gathering at her house and there were shots fired by [Mr Lawley], and she [did not] know who was there, people were fleeing, she [did not] know who was still there . . . ." (Tr. 9: 16–20.) Ms. Gardener testified that she "let [the police officers] know that the only person that would be up at the house would be [Mr. Lawley] and that he should be the only one there." (Tr. 109: 20–22.) Officer Whitby also testified that Ms. Gardener told him that Mr. Lawley fired the shots outside of the home—not inside it. (*See* Tr. 25: 3–5.) Officer Whitby further testified that he could not recall if Ms. Gardener had told him that Mr. Lawley had fired shots into the air. (Tr. 25: 3–14.) But Officer Whitby did testify that Ms. Gardener never told him Mr. Lawley had shot anyone. (Tr. 25: 19–21.) Nor did the police have any information that anyone had been shot. (*See* Tr. 25: 25; 26: 1–2.) Ms. Gardener also showed Officer Whitby a picture of Mr. Lawley on her cell phone so that he would know what he looked like. (*See* Tr. 9: 20–21.)

After Ms. Gardener answered the officers' questions, some of the officers left the area where Mr. Denison had been detained and went towards Ms. Gardener's house. (Tr. 109: 23–25; 110: 1.) Those officers that did not go to the house stayed with Ms. Gardener and Mr. Denison.

---

36: 3.) Officer Whitby then contradicted his prior testimony and stated "He was not handcuffed, but yes." (Tr. 36: 5.)

(Tr. 110: 2–7.) Ms. Gardener testified that she "was told [she could not] leave," and that she and Mr. Denison had "to stay there and wait." (*See* Tr. 110: 4–7.)

2. <u>The First Warrantless Entry and Search of the Home</u>

Officer Whitby was one of the officers that went towards the house. (*See* Tr. 10: 13–18.) Around this time, Officer Whitby began "communicat[ing] the information" he had received "from Ms. Gardener to the other officers in the area." (Tr. 12: 4–6.) When Officer Whitby arrived near the home, other officers had already begun to set up a containment around the house and were "still kind of covering the street." (*See* Tr. 10: 11–17.) When Officer Whitby arrived near the house, he activated his body camera for the first time. (*See* Defendant's Exhibit 2, Officer Whitby's Body Camera Footage at 00:00–00:2:13.) While the other officers were covering the street, Officer Whitby "made [his] way in to actually observe the actual residence." (Tr. 11: 17–18.)

Officer Whitby was the first to approach the house. (*See* Defendant's Exhibit 2 at 00:2:12–00:2:25.) He first stood behind a bush near the front door of the home. (Defendant's Exhibit 2 at 00:2:12–00:2:20.) Officer Whitby saw Mr. Lawley open the door and he ordered him to put his hands up. (Defendant's Exhibit 2 at 00:2:12–00:2:25.) Mr. Lawley quickly retreated into the home. (*See* Defendant's Exhibit 2 at 00:2:25–00:2:29.) Officer Whitby walked from behind the bush towards the front of the home. (*See* Defendant's Exhibit 2 at 00:2:24–00:2:30.) Mr. Lawley then reemerged from the home with his hands up, coming through the front door. (Defendant's Exhibit 2 at 00:2:30–00:2:55.) The front door closed on its own behind Mr. Lawley. (Defendant's Exhibit 2 at 00:2:36–00:2:40.)

Sergeant Ziegler arrived at the house around the time Mr. Lawley exited his home. (*See* Defendant's Exhibit 3, Sergeant Ziegler's Body Camera Footage at 00:00–00:00:08.) Mr.

Lawley walked down the front porch stairs and laid on the ground—surrendering to the police. (Defendant's Exhibit 2 at 00:2:30–00:2:55.) While Mr. Lawley was on the ground, Sergeant Ziegler and a female officer placed Mr. Lawley in handcuffs. (Defendant's Exhibit 3 at 00:00:20–00:00:37.) Sergeant Ziegler and the female officer then walked Mr. Lawley away from the house back to one of the police officer's cars. (Defendant's Exhibit 3 at 00:1:18–00:2:30.)

Officer Whitby did not walk to the car but stayed at the home with Officer Legua and another unidentified officer. (*See* Defendant's Exhibit 2 at 00:3:00–00:5:10.) Officer Whitby then began talking on the radio with Officer Thomas, who was still with Ms. Gardener and Mr. Denison. (Tr. 22: 21–23; Tr. 23: 1–2; *see also* Defendant's Exhibit 2 00:3:40–00:4:00.) Officer Thomas can then be heard on Officer Whitby's radio recording saying "she" (Ms. Gardener), "is saying it is just her and then the two guys that live there, but she is not sure if he is there. She just said he might be." (Defendant's Exhibit 2 at 00:3:52–00:3:59.) As Officer Whitby was walking up the front porch stairs he responded to Officer Thomas by asking "what's his name?" (Defendant's Exhibit 2 at 00:4:00–00:4:05.) Officer Whitby then opened the home's front door, which was closed at this time, and yelled "Ogden Police, K-9, call out now if you're in here." (Defendant's Exhibit 2 at 00:4:05–00:4:11.) No one responded. (*See* Defendant's Exhibit 2 at 00:4:13–00:4:16; *see also* Tr. 22: 19–20.) In response to the front door beginning to close on its own, Officer Whitby pushed it open. (Defendant's Exhibit 2 at 00:4:15–00:4:20.) Officer Whitby continued to hold the door open and look inside the home—seeing no one. (Defendant's Exhibit 2 at 00:4:20–00:4:30.) Officer Thomas then said over the radio: "she is saying his name is Gee." (Defendant's Exhibit 2 at 00:4:32–00:4:35.) Officer Whitby then asked Officer Thomas "Jayden?" (Defendant's Exhibit 2 at 00:4:34–00:4:36.) Officer Thomas responded "[s]he is saying Gee as in golf, echo, echo." (Defendant's Exhibit 2 at 00:4:40–00:4:42.) Officer Whitby

then replied "copy, we got him. Is there anybody else?" (Defendant's Exhibit 2 at 00:4:43–00:4:46.) Officer Thomas responded  "negative." (Defendant's Exhibit 2 at 00:4:50–00:4:51.)

Immediately after Officer Thomas confirmed that Ms. Gardener did not believe anyone else was in the home, and after having not seen or heard anyone inside the home, Officer Whitby entered the home with Officer Legua and another officer. (Defendant's Exhibit 2 at 00:4:52–00:5:05.) Officer Whitby went through the living room to the edge of the kitchen. (Defendant's Exhibit 2 at 00:4:53–00:5:10.) Officer Legua and the other officer went through the living room and then entered Mr. Denison's bedroom. (Defendant's Exhibit 2 at 00:4:59–00:5:09.) While Officer Legua and the other officer were searching other areas of the home, Officer Whitby stood at the entrance of the kitchen. (Defendant's Exhibit 2 at 00:5:05–00:5:37.) Officer Whitby then walked through the kitchen to the edge of a small laundry room in the back of the house. (Defendant's Exhibit 2 at 00:5:38–00:5:43). The laundry room had a stairway that connected to the basement. This laundry room and the kitchen were connected by a doorway. (Defendant's Exhibit 2 at 00:5:38–00:5:43). Officer Whitby passed through this open door to the top of the laundry room's stairway. (Defendant's Exhibit 2 at 00:6:19–00:6:30). The other officers then also entered the laundry room behind Officer Whitby. (*See* Exhibit 2 at 00:6:30–00:6:34.) Officer Whitby and the other officers then walked down the stairs to the basement. (Exhibit 2 at 00:6:40–00:7:05.)

While searching the basement, the officers observed a box of ammunition, a bullet magazine, and a drug pipe. (Tr. 17: 3–11.) After completing their search of the basement, the three officers then regrouped in the basement room just below the laundry room. (Defendant's Exhibit 2 at 00:8:49–00:8:53.) Officer Whitby and Officer Legua then made eye contact with one another and simultaneously put their hands towards their body cameras—shutting them off.  (*See*

Defendant's Exhibit 2 at 00:8:54–00:8:57; *see also* Tr. 32: 22–24 (**Q.** "So you turn off your video and he turns off his video at the same time, correct?" **A.** "Yes").)

Because Officer Whitby and Officer Legua turned off their body cameras, there is no video recording of the officers walking back up the basement stairs. (Tr. 30: 22–23.) Nor is there a video recording of the officers walking through the kitchen. (Tr. 31: 1–2.) Nor is there any video recording of the officers walking through the living room and out the home's front door. (Tr. 30: 24–25; 31: 3–4.) It is unclear from the record how much time lapsed before the officers again turned their body cameras on. While Officer Whitby, Officer Legua, and the other officer were in the house, Sergeant Ziegler was by a police car talking to Mr. Lawley with the female officer.

### 3. The Time Between the Two Searches

By the time Sergeant Ziegler had walked back to the house from the police car, Officer Whitby, Officer Legua, and the other officer had completed their search and were standing outside of the home. (*See* Defendant's Exhibit 3 at 00:8:00–00:8:31.) As Sergeant Ziegler approached Officer Whitby and Officer Legua, Officer Whitby told Sergeant Ziegler "we just cleared the residence." (Defendant's Exhibit 3 at 00:8:00–00:8:32.) After some more discussion, Sergeant Ziegler then asked Officer Whitby "now she's [Ms. Gardener] given us consent to be in there, or?" (Defendant's Exhibit 3 at 00:8:49–00:8:52.) Officer Whitby then responded "well, I . . . I went in because of exigency." (Defendant's Exhibit 3 at 00:8:53–00:8:56.) Sergeant Ziegler then muted his body camera's microphone. (Defendant's Exhibit 3 at 00:8:56–00:8:57.)

For approximately another one minute and twenty seconds, the officers appear to be talking, but because the microphone has been muted, it is impossible to know what they are saying. (Defendant's Exhibit 3 at 00:9:00–00:10:20.) Sergeant Ziegler then walked from the

house (Defendant's Exhibit 3 at 00:10:20–00:11:30), got in his police car, and began driving. (Defendant's Exhibit 3 at 00:11:30–00:11:40.) After about fifteen seconds, it appears that he arrived at the area where Ms. Gardener had been waiting with Mr. Denison. (*See* Defendant's Exhibit 3 at 00:11:40–00:11:55; *see also* Tr. 48: 16–18.) For approximately seven seconds, Ms. Gardener can be seen holding her cell phone, walking up to, and standing near, Sergeant Ziegler's car. (Defendant's Exhibit 3 at 00:11:58–00:12:02; 00:12:05–00:12:08.) But any conversation that occurred at this point cannot be heard because Sergeant Ziegler's body camera's microphone is still muted.

Ms. Gardener testified that, as ordered by the police officers, she had been sitting with Mr. Denison for about 15–20 minutes before two of the officers returned from her house. (*See* Tr. 110: 8–13; *see also* Tr. 122: 1–5.) Ms. Gardener testified that "[a]fter the two officers had been up to the house . . . that . . . they came back down, [and] the one officer pulled up and said that he needed [her] to go back and escort them to the house so they could do a clean sweep of [her] house."[2] (Tr. 110: 12–15.) Ms. Gardener asked the officer "what the heck" a clean sweep was. (Tr. 110: 16–17.) The officer responded that "they wanted to verify that nobody else was in [Ms. Gardener's] residence and there were no weapons in [her] residence."[3] (Tr. 110: 8–13.) To be clear, this was after the police officers had already searched the home and had confirmed that no one was in it.

Ms. Gardener testified that she told the officers that "if they had [Mr. Lawley] in custody, then everybody should be out of the house and there should be nobody else there." (Tr. 121: 21–

---

[2] Here, it appears that Ms. Gardener is referring to Sergeant Ziegler—whose body camera footage revealed that he did pull up in his police car to where Ms. Gardner had been standing. (*See* Defendant's Exhibit 3 at 00:11:59–00:12:02; 00:12:05–00:12:08.)

[3] Sergeant Ziegler testified that he "went back to [his] vehicle and coordinated with the homeowner and took her back to the house so [they] could work the scene from there." (Tr. 48: 17–19.)

24.) She also testified that "it was ridiculous," that she "shouldn't have had to sit down there on the street for over 20 minutes," and that she "should have been able to go back to [her] house." (Tr. 121: 21–24.) Despite her frustration, Ms. Gardener did not feel like she could tell the police officers that they could not conduct a clean sweep. (Tr. 111: 1–10.) She felt "like [she] was being swarmed by police," and "felt like if [she] was not cooperative . . . that [she] was going to be the one going away as well." (Tr. 111: 1–5.) She felt like if she "held [her ground and boundaries, that [she] would be arrested." (Tr. 121: 15–16.) She was also concerned that Mr. Denison could be arrested. (Tr. 111: 9–10.)

4. The Second Warrantless Entry and Search of the Home

After the police told Ms. Gardener that they needed to do a clean sweep of the home, she and Mr. Denison "walked back up to the house to meet the police . . . ."[4] (Tr. 111: 13–14.) Some of the officers drove alongside them as they walked. (*See* Tr. 111: 16–17.) She testified that when she arrived, "there were at least three or four officers right there on the residence." (Tr. 111: 17–18.) Sergeant Ziegler's body camera reveals that he, Officer Legua, and another officer were in the area of the home prior to Ms. Gardener and Mr. Denison arriving back from where they had been held, but Sergeant Ziegler was the closest to the home. (*See* Defendant's Exhibit 3 at 00:16:04–00:18:20.) As Ms. Gardener walked up the porch stairs to enter her home, Sergeant Ziegler followed closely behind her—unmuting his body camera's microphone at this time. (Defendant's Exhibit 3 at 00:18:20–00:18:24.) The front door was propped wide open—no longer closing on its own as it had previously. (Defendant's Exhibit 3 at 00:18:20–00:18:26.)

---

[4] Sergeant Ziegler testified that he thought he gave Ms. Gardener and Mr. Denison a ride back to the house, but he did not know—"[t]hat [was] just [his] recollection and that could be wrong" because he did not remember. (Tr. 81: 6; Tr. 85: 19–22.) Sergeant Ziegler's body camera footage shows him getting out of the car. Neither Ms. Gardener nor Mr. Denison are in the car with him. (*See* Defendant's Exhibit 3 at 00:16:02–00:16:06.)

As Ms. Gardener was walking through the open door, Sergeant Ziegler asked her "do you mind if we search the areas that you guys go into and make sure we don't have the gun somewhere?" (Defendant's Exhibit 3 at 00:18:28–00:18:35.) Sergeant Ziegler followed Ms. Gardener through the open door and entered the home as he was asking this question, without having received an answer from Ms. Gardener. (Defendant's Exhibit 3 at 00:18:28–00:18:38.) With Ms. Gardener's back to him, he then asked "you cool with that?" (Defendant's Exhibit 3 at 00:18:35–00:18:36.) Ms. Gardener did not respond, so he asked "mam?" (Defendant's Exhibit 3 at 00:18:36–00:18:37.)

Now in the living room just outside the door to Mr. Denison's bedroom, Ms. Gardener turned to Sergeant Ziegler and said "yea, this is [Mr. Denison's] room, I know that if there's guns anywhere they're more than likely downstairs." (Defendant's Exhibit 3 at 00:18:36–00:18:42.) Sergeant Ziegler then followed Mr. Denison into the bedroom and said "K, we're just going to make sure there's—you good with that [Mr. Denison]?" (Defendant's Exhibit 3 at 00:18:43–00:18:49.) Mr. Denison replied "I'm not trippin' I ain't got nothing to hide . . . ." (Defendant's Exhibit 3 at 00:18:43–00:18:51.) Sergeant Ziegler then began searching through Mr. Denison's belongings and said "K, I just want to make sure you didn't dump it in here." (Defendant's Exhibit 3 at 00:18:51–00:18:55.) Sergeant Ziegler continued to search through the belongings for less than a minute and then exited the bedroom to go into the living room. (Defendant's Exhibit 3 at 00:18:55–00:19:43.) At this point, there were at least three officers in the home—Sergeant Ziegler, Officer Whitby, and another officer. (*See* Defendant's Exhibit 3 at 00:19:30–00:19:43.)

As Sergeant Ziegler was exiting the bedroom to go into the living room, Ms. Gardener was standing in the living room with Officer Whitby and can be heard telling Officer Whitby

"feel free, yes, however, whatever is in the basement, I am not responsible for." Sergeant Ziegler then walked straight towards the couch that was next to the front door and removed a pillow, discovering the gun. (Defendant's Exhibit 3 at 00:19:50–00:19:56.) Sergeant Ziegler then said "right here." (Defendant's Exhibit 3 at 00:19:56–00:19:57.) Officer Whitby responded "got it?" (Defendant's Exhibit 3 at 00:19:57–00:19:58.) Sergeant Ziegler said "yeah," and Officer Whitby replied "figured." (Defendant's Exhibit 3 at 00:19:58–00:20:00.)

After Sergeant Ziegler discovered the gun, he took a picture of it with his phone. (Defendant's Exhibit 3 at 00:20:30–00:20:35.) Ms. Gardener then asked the officers "can I get a picture of that as well too, please?" (Defendant's Exhibit 3 at 00:20:35–00:20:38.) Officer Whitby then told Ms. Gardener "hang tight for us, ok?" (Defendant's Exhibit 3 at 00:20:39–00:20:42.) Ms. Gardener then said "oh no, not at all, I don't want to step on your guys' toes at all." (Defendant's Exhibit 3 at 00:20:39–00:20:44.) Officer Whitby then told Ms. Gardener "thank you, I appreciate your cooperation . . . ." (Defendant's Exhibit 3 at 00:20:43–00:20:46.) Ms. Gardener responded "No, trust me, I'm not trippin' on this whole thing because I don't, I . . . wow." (Defendant's Exhibit 3 at 00:20:46–00:20:49.) Sergeant Ziegler then told Ms. Gardener "if at any time you don't want us looking in your house, let us know, ok?" (Defendant's Exhibit 3 at 00:20:50–00:20:54.) Ms. Gardener then responded "no, I want uh . . . ." (Defendant's Exhibit 3 at 00:20:55–00:20:58.) Sergeant Ziegler then said "K, I just wanted to let you know you can, let us know that." (Defendant's Exhibit 3 at 00:20:58–00:21:01.) Ms. Gardener can then be heard saying "I want it all out of the house." (Defendant's Exhibit 3 at 00:21:03–00:21:04.) She can also be heard saying "they're going to do their job, I don't care if they're here the next two days." (Defendant's Exhibit 3 at 00:21:10–00:21:15.)

Sergeant Ziegler then electronically drafted an affidavit for a search warrant. (*See* Tr. 53: 13–15.) In this affidavit, Sergeant Ziegler stated that he had discovered the gun during his search of the residence pursuant to Ms. Gardener's consent. (Plaintiff's Exhibit #3 at 4.) He also stated that "firearm magazines, a box of ammunition, and a multi-colored glass pipe" had been observed during the "protective sweep" of the home. (Plaintiff's Exhibit #3 at 5.)

## ANALYSIS

The Fourth Amendment to the Constitution protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "'The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *United States v. Edwards*, 813 F.3d 953, 962 (10th Cir. 2015) (quoting *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). "A warrantless search of an individual's home is 'per se unreasonable under the Fourth Amendment unless the [G]overnment can show that it falls within one of a carefully defined set of exceptions.'" *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010) (quoting *United States v. Cos*, 498 F.3d 1115, 1123 (10th Cir. 2007)). In its Opposition to Mr. Lawley's Motion to Suppress, the Government initially relied on three of those exceptions to justify the officers' actions—the protective sweep doctrine, exigent circumstances, and consent. (*See* ECF No. 23 at 5–6.) But at oral argument the Government abandoned its reliance on the protective sweep doctrine. (Oral Argument Tr. 14–15.[5]) The court therefore only examines whether the Government has justified the warrantless searches under either exigent circumstances or consent. The Government's reliance on exigent circumstances deals with the officers' initial warrantless entry into the home. Consent relates to the officers' second

---

[5] THE COURT: "So you're under the second *Buie* exception."
MR. SMITH: "And I'm not even sure that – that it is . . . my position that this is a valid protective sweep. I think it is an exigent argument. It is exigency that they didn't know based"
THE COURT:" So let's make -- so you're not arguing under either of the two *Buie* exceptions."
MR. SMITH: "I think I would abandon that argument."

warrantless entry into the home—the Government argues that Ms. Gardener consented to the second search.

I.    Exigent Circumstances

"Warrants are generally required to search a person's home . . . unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006) (citation omitted) (internal quotation marks omitted). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id*. Thus, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. "In this context," the Tenth Circuit has "held that exigent circumstances 'exist when: (1) the law enforcement officers have objectively reasonable grounds to believe that there is an immediate need to protect their lives or others, and (2) the manner and scope of the search is reasonable.'" *McInerney v. King*, 791 F.3d 1224, 1231 (10th Cir. 2015) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1124 (10th Cir. 2007) (en banc)). "The burden is on the [G]overnment to demonstrate the existence of exigent circumstances." *Mascorro v. Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011) (citing *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)).

The Government fails to meet its burden in this case because the police officers did not have objectively reasonable grounds to believe there was an immediate need to protect anybody inside the home. The officers had no reason to believe anyone remained in the home after arresting Mr. Lawley. After Officer Whitby detained Mr. Denison, Ms. Gardener told Officer Whitby and other officers that Mr. Lawley "should be the only one" at the house. (Tr. 109: 20–

22.) Officer Whitby received further confirmation from Officer Thomas that this was Ms. Gardener's belief before entering the home. (*See* Defendant's Exhibit 2 at 00:3:52–00:4:51.) This is significant because Officer Whitby knew, prior to entering the home, that Mr. Lawley was the individual who had just been arrested. (*See* Defendant's Exhibit 2 at 00:3:52–00:4:51.)

Additionally, Officer Whitby called out multiple times before entering the home and did not hear a response. (*See* Defendant's Exhibit 2 at 00:3:52–00:4:51.) Nor did he see anyone in the home after opening the front door and looking in. (*See* Defendant's Exhibit 2 at 00:3:52–00:4:51.) Officer Whitby also testified that Ms. Gardener had already told him, before he entered the home, that Mr. Lawley fired the shots outside of the home—not inside it. (*See* Tr. 25: 3–5.) And he testified that Ms. Gardener never told him Mr. Lawley had shot anyone. (Tr. 25: 19–21.) In fact, he admitted that the police did not have *any* information that anyone had been shot. (*See* Tr. 25: 25; 26: 1–2.)

The police officers did not have objectively reasonable grounds to believe anyone was in the home that they needed to protect themselves from. Nor did they have a reason to believe someone inside the home was injured. For these reasons, the police officers' warrantless entry into the home was not justified under the exigent circumstances exception to the Fourth Amendment search warrant requirement. The initial entry and search therefore constituted a Fourth Amendment violation.

II.  Consent

"When a consensual search is preceded by a Fourth Amendment violation . . . the [G]overnment must prove not only the voluntariness of the consent under the totality of the circumstances, but the [G]overnment must also establish a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Carter*, 360 F.3d

1235, 1243 (10th Cir. 2004). Additionally, where, as here, the consent is obtained from a third party, the Government must prove that the third-party had "actual or apparent authority" to consent. *See United States v. Sanchez*, 608 F.3d 685, 689 (10th Cir. 2010).

A.  Actual Authority

The Government has cited well-established authority to support its argument that Ms. Gardener,  as a co-habitant of the home, had the authority to consent to the search of the living room—a common area of the house. (*See* ECF No. 23 at 12 (citing *United States v. Rith*, 164 F.3d 1323, 1328 (10th Cir. 1999).) The court agrees. No further analysis is needed on this point.

B.  Voluntariness

The Tenth Circuit utilizes a two-part test to determine voluntary consent: "(1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012).

As to the first part of the test, the relevant question here is whether the police officers received consent to search the home prior to entering. The Government has pointed to no evidence in the record demonstrating that Ms. Gardener gave express consent to search the home. (*See* ECF No. 23 at 12–15.) Instead, the Government argues that the officers received implied consent. (Oral Argument Tr. 10: 13–15.)

"Implied consent to search" is "no less valid" than "explicit" "oral or written" consent. *Jones*, 701 F.3d at 1321. Consent "must be clear, but it need not be verbal." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). "Consent may . . . be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *Id*. at  789–90. The Government relies on *United States v. Jones* in support of its argument that the police received implied consent. (*See* ECF No. 23 at 12–15.)

In *Jones* the Tenth Circuit upheld a denial of a motion to suppress where the defendant never gave oral or written consent for the officers to enter his residence. *See Jones*, 701 F.3d at 1321–22. In that case the defendant was detained in an alley behind his residence after the officers took his license. *Id*. at 1305; 1318. Sometime after an officer took the license, the officer indicated, "without explicitly saying so," that the officers "would like to search [the defendant's] residence," at which point the defendant "responded by turning and beginning to walk toward the back door of his residence." *Id*. at 1306; 1321. "Upon walking up to his backdoor, [the defendant] made no attempt to stop the officers—through words or otherwise—from following him into his residence." *Id*. "Nor did [the defendant] inquire why the officers were following him." *Id*. The defendant also made the "affirmative act" of unlocking his door and "once inside, turning toward the officers to make a gesture with his hands as if to state 'see, I got no plants, I got nothing.'" *Id*. The Tenth Circuit held that "there [could] be no doubt that [the defendant's] actions . . . though non-verbal . . . could have reasonably been interpreted by the . . . officers as communicating [the defendant's] consent to their accompanying him into his home." *Id*.

Here, like in *Jones*, Ms. Gardener made no attempt to stop the officers from following her into her residence. But unlike in *Jones*, Ms. Gardener's conduct did not constitute legally sufficient consent for the officers to enter the residence. There are two key differences between the facts of this case and the facts of *Jones* that lead to this conclusion. First, Ms. Gardener never made the "affirmative act" of unlocking and opening her door because the door was already propped open when she arrived at her home. The front door was wide open despite the fact that it had previously been closing on its own prior to the officers' initial entry. (Defendant's Exhibit 3 at 00:18:20–00:18:26.) Second, unlike in *Jones* where the officers indicated that they "would like" to search the defendant's residence, here the officers told Ms. Gardener that they "*needed*

[her] to go back and escort them to the house so they could do a clean sweep of [the] house."

(ECF No. 110 at 14–15 (emphasis added).) This fact makes the officers' reliance on Ms.

Gardener's purported non-verbal consent less reasonable than in *Jones*.

Admittedly, as the Government points out, Ms. Gardener did tell the officers that she

"want[ed] it all out of the house." (Defendant's Exhibit 3 at 00:21:03–00:21:04.) And she can

also be heard saying "they're going to do their job, I don't care if they're here the next two

days." (Defendant's Exhibit 3 at 00:21:10–00:21:15.) But Ms. Gardener gave these statements

*after* the police officers had entered her home and *after* they had already discovered the gun.[6]

The relevant question here is whether the police officers obtained consent prior to entering the

home—not after. The court finds that Ms. Gardener did not give implied consent to the police to

search the home.

The court nevertheless considers, under the assumption that Ms. Gardener did give

consent, whether her consent was freely and voluntarily given. The Government has the burden

to prove that the consent "was freely and voluntarily given, a burden that is not satisfied by

showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497,

103 S. Ct. 1319, 1324, 75 L. Ed. 2d 229 (1983). "In determining the voluntariness of consent, the

Fourth Amendment requires that . . . consent not be coerced, by explicit or implicit means, by

implied threat or covert force." *Jones*, 701 F.3d at 1317–18 (10th Cir. 2012) (citation omitted)

(internal quotation marks omitted). The "question whether a consent to a search was in fact

---

[6] Ms. Gardener made these statements after Sergeant Ziegler entered the home as he asked her "do you mind if we search the areas that you guys go into and make sure we don't have the gun somewhere?" (Defendant's Exhibit 3 at 00:18:28–00:18:35.) Not receiving a response, and with Ms. Gardener's back to him, he then asked "you cool with that?" (Defendant's Exhibit 3 at 00:18:35–00:18:36.) Ms. Gardener again did not respond, so he asked "mam?" (Defendant's Exhibit 3 at 00:18:36–00:18:37.) Ms. Gardener's initial non-response cannot reasonably be interpreted as her having given implied consent.

'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 1318 (citation omitted) (internal quotation marks omitted). "When considering the totality of the circumstances, some of the relevant considerations include"

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*Id.* at 1318 (citation omitted) (internal quotation marks). Courts may also consider whether the individual was detained at the time she gave consent but "'detention is only one factor,'" and it is "not necessarily dispositive of voluntariness." *See United States v. Lopez-Casillas*, No. 215CR00488JNPDBP1, 2017 WL 1750288, at *7 (D. Utah May 3, 2017) (citing *United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007)).

The Government argues that Ms. Gardener's consent was voluntary and not the product of coercion because "[t]here was no violence, threats, promises, deception, trickery or an aggressive tone" and "she was not physically mistreated." (ECF No. 23 at 15.) Mr. Lawley, on the other hand, argues that there was deception and trickery. (*See* ECF No. 20 at 22.) Mr. Lawley argues that "[t]he police seem to have fooled [Ms. Gardener] into believing the purpose of the second search was to conduct a 'clean sweep.'" (ECF No. 20 at 22.) Here, Mr. Lawley relies on Ms. Gardener's testimony where she provided that an officer had told her that the officers "needed [her] to go back and escort them to the house so they could do a clean sweep of [her] house." (Tr. 110: 12–15.) When she asked what a "clean sweep" was, the officer responded that "they wanted to verify that nobody else was in [Ms. Gardener's] residence and there were no

weapons in my residence." (Tr. 110: 8–13.) This occurred after the police officers had already

searched the home during their initial entry, and had confirmed that no one was in the house.

Importantly, Mr. Lawley argued that "[t]here was no testimony deduced at the evidentiary

hearing to contradict [Ms. Gardener's] recollection of what she was told regarding the purpose of

the second search of her home." (ECF No. 20 at 22.)

In its Opposition, the Government did not respond to Mr. Lawley's arguments regarding

whether the police had tried to fool Ms. Gardener. (*See* ECF No. 23 at 13–15.) In failing to

respond to Mr. Lawley's arguments, the Government also failed to point to any evidence

contradicting Ms. Gardener's testimony regarding the "clean sweep." But at oral argument the

court gave the Government an opportunity to address this issue. (Oral Argument Tr. 47: 10–12.[7])

The Government did not point to any specific evidence contradicting Ms. Gardener's testimony.

(*See* Oral Argument Tr. 47–48.) Instead, the Government argued that the court should not

believe Ms. Gardener's testimony because Sergeant Ziegler's body camera video recording (of

the second search of her home, after Sergeant Ziegler unmuted his microphone) shows that she

was cooperative, and demonstrates that she testified "with a different attitude than . . . the video

shows that night." (*See* Oral Argument Tr. 47: 22–24.) The court rejects the Government's

argument. Because the Government bears the burden of proof on this issue, and because the

Government has not offered any contrary evidence, the court accepts Ms. Gardener's testimony

regarding the "clean sweep" as true.

Further, the court notes that the Government has "acknowledged that the Ogden Police

Department has policies that govern body cameras and that some of these policies were

violated." (ECF No. 23 at 18.) The policy provides that "[o]fficers shall activate the [body worn

---

[7] (Oral Argument Tr. 47: 9–12.) ("Second, how do you respond to the argument that Ms. Gardner was told we need
to conduct a protective sweep when they had already completed one?")

camera] prior to any law enforcement encounter, or as soon as reasonably possible after that encounter is initiated." (ECF No. 20-1 at 3.) Officer Whitby testified that he did not turn on his body camera prior to his initial encounter with Mr. Denison and Ms. Gardener, so there is no video recording of that interaction. (Tr. 35: 11–12.) Nor did Sergeant Ziegler unmute his microphone during his conversation with Ms. Gardener prior to the second entry into the home. (*See* Defendant's Exhibit 3 at 00:11:58–00:15:17.) In fact, it does not appear that any of the officers recorded any of their conversations with Ms. Gardener around the time that the "clean sweep" discussion took place—despite the fact that Ms. Gardener was with officers from the time of Mr. Denison's detention through the second search of the home. Had the officers recorded this interaction, the Government would have been able to provide evidence regarding what was said to Ms. Gardener prior to the second entry into the home. But they did not. Again, because the Government bears the burden of proof on this issue, and because it has offered no contrary evidence, the court accepts Ms. Gardener's testimony as true.

Accepting Ms. Gardener's testimony regarding the "clean sweep" as true, and assuming the officers received implied consent, the court now considers whether Ms. Gardener's consent was freely and voluntarily given. The court agrees with the Government that there is no evidence that the police officers used violence, or that they physically mistreated Ms. Gardener. Nor is there any evidence in the record that the officers displayed their weapons to Ms. Gardener. These factors weigh in the Government's favor.

But there is evidence of deception and trickery. A police officer told Ms. Gardener, after the officers had already confirmed that no one was in the house, that they "needed" to conduct a clean sweep in order to "verify that nobody else was in [Ms. Gardener's] residence . . . ." (Tr. 110: 8–13.) This was deceptive, and weighs heavily against the Government.

The Government also argues that "Ms. Gardener was told that she could refuse to consent." (ECF No. 23 at 15; *see also* ECF No. 23 at 13 (citing to Tr. 117–18).) Here, the Government is referring to Sergeant Ziegler telling Ms. Gardener "if at any time you don't want us looking in your house, let us know, ok?" (Defendant's Exhibit 3 at 00:20:50–00:20:54.) But Sergeant Ziegler told Ms. Gardener this *after* he had already entered the house, and *after* he had already found the gun. The Government has not pointed to any evidence that the police officers informed Ms. Gardener of her right to refuse consent *prior* to their second entry into the home. In fact, Sergeant Ziegler admitted that, prior to entering the home, he never explained to Ms. Gardener that she could refuse to consent. (Tr. 86: 16–20.[8]) The court finds that the Government has not offered any evidence that the officers informed Ms. Gardener of her right to refuse consent prior to their entering the home for the second time. This factor weighs against the Government.

The court also finds that Ms. Gardener was detained prior to the officers entering the home for the second time. Ms. Gardener testified that the officers told her she could not leave the area where Mr. Denison was initially detained, and that they both "had to stay there and wait." (*See* Tr. 110: 4–7.) She was also told that she could not go back to her house. (*See* Tr. 122: 7–8.) After the officers told her they needed to conduct a "clean sweep," some of the officers drove alongside Ms. Gardener and Mr. Denison as they walked back to the house. (*See* Tr. 111: 16–17.) And there were at least three officers waiting near her house when she and Mr. Denison arrived back at the home. (*See* Defendant's Exhibit 3 at 00:16:04–00:18:20.) The court finds that Ms. Gardener was detained prior to and during the time she gave the purported implied consent. This weighs against the Government.

---

[8] (Tr. 86: 16–20 (**Q.** "You didn't have her fill out a consent to search form?" **A.** "No." **Q.** "And at that point that you were entering her home before she had answered the question, you never told her that she had the right to say no?" **A.** "To say no to?" **Q.** "To have you come inside." **A.** "No, I did not say that.").)

The court also notes that there were at least six officers on scene the night of the incident in question. (Tr. 62: 1–13.) Officer Whitby testified that there were "quite a few officers" on the scene that night. (Tr. 6: 12.) Ms. Gardener testified that she felt like she "was being swarmed by police." (Tr. 111: 1–5.) There is no evidence in the record to determine exactly how many officers were around Ms. Gardener when they told her about the need to conduct the "clean sweep." But there were at least three officers in the area of the home prior to Ms. Gardener and Mr. Denison arriving back to the home after being detained. (*See* Defendant's Exhibit 3 at 00:16:04–00:18:20.) And there were additional officers in their cars who accompanied Ms. Gardener and Mr. Denison on this walk. (*See* Tr. 111 13–16.) The court finds that the number of officers on the scene is a factor that weighs slightly against the Government.

After considering the totality of the circumstances, the court finds that the relevant factors weigh in Mr. Lawley's favor. Ms. Gardener's consent to search was not voluntarily and freely given.

To summarize, the court finds that Ms. Gardener did not give the officers express consent to search the home. Nor did she give implied consent. But even if a reasonable officer could have validly interpreted Ms. Gardener's actions as her having granted implied consent, the consent was not voluntarily or freely given—in large part because of the (uncontradicted) evidence that the police engaged in deception and trickery regarding the need to conduct a "clean sweep."

C.  Taint

As explained above, the court finds that Ms. Gardener did not give consent. The court nevertheless considers, under the assumption that Ms. Gardener did voluntarily consent, whether the initial entry and search of the home tainted Ms. Gardener's consent. The Tenth Circuit has "held that a search that is preceded by a Fourth Amendment violation may still be valid if the

defendant's consent to that search 'was voluntary in fact under the totality of the circumstances.'" *United States v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001) (citation omitted). "When there has been such a violation, the [G]overnment bears the heavy burden of showing that the primary taint of that violation was purged." *Id.* "To satisfy this burden, 'the [G]overnment must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the [illegality] and the consent.'" *See id.* (citation omitted).

To determine whether Ms. Gardener's (alleged) consent was tainted by the police officers' preceding illegal search, both Mr. Lawley and the Government point this court to *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975). In *Brown*, "[t]he Supreme Court . . . provided three factors that are especially relevant to determining whether a consent is tainted by a preceding illegal search or seizure: 1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (citing *Brown*, 422 U.S. at 603–04). "Courts have applied" "the three factors *Brown* articulated" to cases like this—"cases involving motions to suppress allegedly tainted evidence acquired pursuant to third parties granting consent to searches." *United States v. Cordero-Rosario*, 786 F.3d 64, 78 (1st Cir. 2015) (citations omitted).

"The first factor that the Supreme Court identified in *Brown* requires [this court] to consider the time that elapsed between the initial 'illegal' search and the subsequent consent." *United States v. Hill*, 649 F.3d 258, 269 (4th Cir. 2011). Mr. Lawley argues that the time "between the [initial] unlawful [entry] and the moment when [Ms. Gardener] would have given consent to search was less than thirty minutes." (ECF No. 20 at 24.) The Government does not appear to dispute Mr. Lawley on this point. (*See* ECF No. 23 at 16-18.) The limited temporal

proximity between the illegal search and the subsequent consent is a factor that weighs in Mr. Lawley's favor.

"The second factor to consider is the existence and importance of any intervening circumstances." *Hill*, 649 F.3d at 269. "Intervening circumstances that militate in favor of attenuation must be sufficiently important to ensure that potentially tainted evidence was 'come at by way of' some process other than the exploitation of an illegal search." *United States v. Washington*, 387 F.3d 1060, 1073 (9th Cir. 2004) (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S. Ct. 407 (1963)). Officers' continued control of a home subsequent to their illegal search is a significant consideration in determining whether the taint had dissipated. *See Hill*, 649 F.3d at 269.

The Government argues that "the [police officers'] initial entry into the home was not exploited *in any way* to get Ms. Gardner to consent to a search of her home." (ECF No. 23 at 17 (emphasis added).) In contrast, Mr. Lawley argues that "the initial [unlawful entry] is what led to the door being propped open and left in the open position when [Ms.] Gardener was brought back to the home." (ECF No. 20 at 25.) The court finds that officers' exploited their initial illegal entry when they walked through the open door during their subsequent search. This is a significant factor weighing in favor of finding that the initial taint had not dissipated. The Government has not pointed to any intervening circumstance sufficient to ensure that the tainted evidence was not discovered through this exploitation. The second factor weighs in Mr. Lawley's favor.

"The third factor to consider in this analysis is the flagrancy of the police conduct." *Hill*, 649 F.3d at 270. Physical entry into the home is one factor that weighs in favor of finding the conduct to be flagrant. *See id* ("Some factors may weigh in favor of finding the conduct to be

flagrant including that the illegal conduct involves 'the physical entry of the home, which is the chief evil against which the wording of the Fourth Amendment is directed.'") (citation omitted)). "Other factors may weigh in favor of finding the conduct was not flagrant, including that the officers did not use or exploit the evidence that they obtained during the initial search to gain consent." *Id.*

Here, the police officers physically entered the home. That weighs against the Government. On the other hand, there is no evidence in the record that the police officers used any evidence they obtained during the initial search to gain consent from Ms. Gardener. This weighs in the Government's favor. However, as noted above, the initial entry is what led to the door being propped open when Ms. Gardener was brought back to the home. This connects the initial unlawful search to the subsequent search, and weights against the Government. Finally, the court finds that the (uncontradicted) evidence that the officers told Ms. Gardener that they needed to conduct a "clean sweep" to ensure that no one was in the home, after they had already discovered that no one was in the home, is flagrant and weighs heavily against the Government. The court finds that third factor weighs in Mr. Lawley's favor.

All three of the *Brown* factors weigh in Mr. Lawley's favor. The Government has therefore failed to meet its heavy burden of showing that the taint of the initial unlawful entry was purged. Thus, even if Ms. Gardener's consent was voluntary, suppression of the evidence is still required.[9]

---

[9] After the two warrantless searches, the police officers did search the home pursuant to a warrant. Nevertheless, the evidence must still be suppressed as fruit of the poisonous tree. *See United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir. 2003) ("It is clear under the [fruit of the poisonous tree] doctrine that if [a police officer's] observation of [evidence] occurred during or as a result of an unconstitutional search, the evidence seized during the later search conducted pursuant to warrant would be inadmissible as fruit of the poisonous tree." (citing *Murray v. United States*, 487 U.S. 533, 542–44, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)).

## CONCLUSION

The Government has not shown that warrantless searches were justified under an exception to the warrant requirement. For the foregoing reasons, the court therefore GRANTS Mr. Lawley's Motion. (ECF No. 11.)

DATED this 26th day of July, 2018.

BY THE COURT:

Clark Waddoups
United States District Judge